**UNITED STATES of America**

**v.**

**John DOE.**

**In the Matter of a Grand Jury Subpoena Served Upon Leonard S. RODBERG.**

**E.B.D. No. 71–172.**

United States District Court,
D. Massachusetts.

Oct. 4, 1971.

Warren P. Reese, Asst. U. S. Atty., for the United States.

Charles L. Fishman, Herbert O. Reid, Jr., Washington, D. C., Robert J. Reinstein, Philadelphia, Pa., for intervenor.

Doris Peterson, James Reif, Morton Stavis and Peter Weiss, New York City, for movant.

## MEMORANDUM OF DECISION AND PROTECTIVE ORDER

GARRITY, District Judge.

Dr. Leonard S. Rodberg, a physicist and resident fellow at the Institute for Policy Studies in Washington, D. C., and currently engaged as a staff member of United States Senator Mike Gravel of Alaska, petitioned the court on August 27, 1971 to quash a subpoena ordering him to appear before a federal grand jury ostensibly investigating crimes related to the release and dissemination of the much-publicized classified study by the Department of Defense entitled "History of U. S. Decision-Making Process

on Viet Nam Policy," popularly called the "Pentagon Papers."

The crimes being investigated by the grand jury include the retention of public property or records with intent to convert (18 U.S.C. § 641), the gathering and transmitting of national defense information (18 U.S.C. § 793), the concealment or removal of public records or documents (18 U.S.C. § 2071), and conspiracy to commit such offenses and to defraud the United States (18 U.S.C. § 371), as is indicated in the prosecuting attorneys' oaths of office on file with the Clerk.[1]

At the initial hearing on Dr. Rodberg's motion, the court stayed his appearance before the grand jury until after the parties had filed affidavits and briefs and presented further oral argument. Senator Gravel moved for leave to intervene and, after briefing, intervention was allowed and the court accepted motions by the Senator to quash the subpoena and for specification of the exact nature of the questions to be asked of Dr. Rodberg. Both motions of the Senator allege, and the court finds, that "as personal assistant to movant, Dr. Rodberg assisted movant in preparing for disclosure and subsequently disclosing to movant's colleagues and constituents, at a hearing of the Senate Subcommittee on Public Buildings and Grounds, the contents of the so-called 'Pentagon Papers,' which were critical of the Executive's conduct in the field of foreign relations."

Dr. Rodberg's first contention in support of his motion to quash is separate from the argument advanced jointly by

him and Senator Gravel. This contention is that the subpoena violates rights of his under the First Amendment. In a supporting affidavit, Dr. Rodberg states in part that:

"my roles have been multiple: research, writing, lecturing, supervising research projects, as well as providing advise, assistance, information, expertise to Senators and Congressmen for the performance of their official duties, as well as liaison to other persons whose expertise Congressmen require. Experience has shown that my success in fulfilling these multiple roles depends upon my ability to maintain access to a wide variety of confidential sources of information. My knowledge of and ability to communicate and advise on issues relating to government policy in the areas mentioned above would be seriously jeopardized if I should be forced to appear before a secret grand jury."

While recognizing the importance and usefulness of this type of work by men like Dr. Rodberg, and acknowledging the existence of First Amendment interests here, he is only incidentally a journalist and the court rejects this argument for the reasons stated in its memorandum of decision in E.B.D. No. 71–165, Application of Falk, filed contemporaneously herewith.

Dr. Rodberg's other contention, identical to that urged by Senator Gravel, is that the grand jury subpoena served upon him contravenes the Speech or Debate Clause, Article I, section 6, clause 1, of the Constitution of the United States.[2] It is based upon an unusual se-

---

1. Various opinions in New York Times Company v. United States, 1971, 403 U.S. 713, 727–740, 91 S.Ct. 2140, 29 L.Ed.2d 822, emphasized that a criminal prosecution might lie for acts related to the publication of classified materials. Whether such a prosecution would lie for acts subsequent to the placing of classified materials in the public record of a congressional subcommittee, the Supreme Court opinions did not intimate and we have not considered. Obviously there may be no prosecution for publication of declassified materials.

2. Art.' I, § 6, cl. 1 provides, "The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privilged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; *and for any Speech or Debate in either House, they shall not be questioned in any other Place.*" (Emphasis added.) The last clause is known as the Speech or Debate Clause.

quence of events occurring at the height of the court battle over newspaper publication of the controversial Papers. The Court of Appeals for the District of Columbia Circuit had ruled that no prior restraint should issue against publication but the Court of Appeals for the Second Circuit had reached the opposite result. Oral arguments had been heard by the Supreme Court on June 26, 1971. Pending decision by the Supreme Court, publication was temporarily barred. Meanwhile the President had sent a set of the documents to the Congress. On June 30, the Supreme Court affirmed the judgment of the District of Columbia Circuit and reversed that of the Second Circuit, thereby permitting publication. New York Times Company v. United States, *supra*.

Late in the evening of June 29, Senator Gravel, a member of the Committee on Public Works, called a meeting of its Subcommittee on Public Buildings and Grounds, of which he is chairman.[3] Earlier that same day, the Senator had added Dr. Rodberg to his personal staff. At the meeting he read extensively from the study and, at its conclusion, placed the entire study comprising 7,000 pages of complex material in 47 volumes on file with the subcommittee, thereby making it widely available to the press. About seven weeks later, on August 18, it was reported in the Washington Post that Senator Gravel had turned over the Pentagon Papers to a Boston publisher, Beacon Press, for compilation into a four-volume book to be released in late October under the title, "The Senator Gravel Edition of the Pentagon Papers: the Defense Department History of Decision Making on Vietnam"; and that Beacon Press came to agreement with the Senator after negotiations with his assistant Dr. Rodberg. In the August 24 edition of a weekly newspaper, Boston After Dark, an article, "Why MIT & Harvard

Suppressed the Pentagon Papers", described in detail Dr. Rodberg's prior negotiations with publishers other than Beacon Press. On the evening of August 24, Dr. Rodberg was subpoenaed to appear and testify before the current grand jury.

In opposing the motions to quash and for specification, the Government has pointed out that the grand jury proceedings are secret and it has not been proved by the moving parties that Dr. Rodberg will be interrogated about the subjects described in the newspaper stories. However, given the secrecy and flexibility of all grand jury proceedings, no movant ever could demonstrate with certainty the specific facts about which he had been subpoenaed to testify. Viewing together the crimes which this grand jury is investigating and the chronology of acts and events leading up to Dr. Rodberg's subpoena, the court infers that the government's interest in his testimony pertains to his acts as Senator Gravel's assistant with regard to the Pentagon Papers and that the government attorneys plan to question him about them before the grand jury.

The Speech or Debate Clause, in the context of criminal proceedings, has been applied definitively in United States v. Johnson, 1966, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681. Defendant Johnson was a Maryland congressman accused of violating the conflict of interest statute, 18 U.S.C. § 281, and conspiring with codefendants to defraud the United States in violation of 18 U.S.C. § 371. As part of the conspiracy, defendant allegedly delivered for pay a speech in Congress favorable to certain loan companies. Johnson and codefendants were convicted of both crimes. The Court of Appeals had upheld the conspiracy conviction of the coconspirators and the conviction of Johnson under the conflict of interest statute, but held that the con-

---

3. Most of the facts stated in this paragraph appear only in Dr. Rodberg's unverified motion which incorporates as exhibits two newspaper stories thereto attached. They have been adopted as findings by the court for purposes of this decision because not disputed in any way by the Government and because underlying the parties' legal submissions.

spiracy count was "unconstitutional as applied to * * * Johnson." 5 Cir., 337 F.2d 180 at 192. In effect, the Court of Appeals read the Speech or Debate Clause to create an immunity against prosecutions for unlawful acts or motives underlying otherwise privileged legislative conduct. On certiorari granted on the Government's petition, the Supreme Court affirmed the judgment of the Court of Appeals but did not agree as to the breadth of the application of the Speech or Debate Clause. Rejecting the interpretation that the privilege barred the conspiracy prosecution, the Supreme Court instead remanded for a new trial on that count, admonishing however that no evidence of, or inquiry into, the privileged speech would be permitted.

In its opinion in the *Johnson* case, the Supreme Court stated that the privilege must "be read broadly to effectuate its purposes," 383 U.S. at 180, 86 S.Ct. at 755, and that "the privilege was not born primarily of a desire to avoid private suits * * * but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary," at 181, 86 S.Ct. at 755. The Court also ruled that the Clause does not reach "conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process," at 172, 86 S.Ct. at 751, and that its "decision does not touch a prosecution which * * * does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them," at 185, 86 S.Ct. at 758. Thus, the privilege is limited specifically to legislative acts and antecedent conduct so intimately related to them such as cannot be proved without resort to inquiry into legislative acts.

Another relevant fundamental principle is that the legislative privilege conferred by the Speech or Debate Clause belongs to Congressmen only and not to their assistants and aides. In the first place, the Constitution mentions only Senators and Representatives. Second-ly, Thomas Jefferson's authoritative interpretation of the privilege, in Jefferson's Manual of Parliamentary Practice, Section III, reprinted in the Senate Manual, 1967, 382-383, states that "the framers of our Constitution * * * have only privileged Senators and Representatives themselves. * * *" Thirdly, no case or other authority indicates to the contrary. Cf. Powell v. McCormack, 1969, 395 U.S. 486, 504-506, 89 S.Ct. 1944, 23 L.Ed.2d 491, holding that employees of the House of Representatives might be sued in a civil action which would be barred against Congressmen by the legislative privilege.

It follows that while the Speech or Debate Clause plainly sets limitations upon the grand jury's investigation, the motions to quash the subpoena served on Dr. Rodberg seek too broad a result. Without doubt he may be questioned as to the activities of third parties with whom he and the Senator dealt. He may also be questioned about, and is legally responsible for, his own actions previous to his joining the Senator's personal staff on June 29 and many of his actions thereafter. That the Senator's legislative privilege will serve to bar some questions, as hereinafter ruled, does not by any means excuse Dr. Rodberg from appearing and answering questions on subjects beyond the protection of the privilege.

Similarly, Senator Gravel's motion for specification which seeks an order requiring the Government to specify in detail the purpose, scope and exact nature of questions to be asked of Dr. Rodberg will not be granted in terms. In the court's opinion such an order is unnecessary in the circumstances of this case to afford full protection to the Senator's legislative privilege and would moreover impede the grand jury in the discharge of its investigative duties. As stated in Blair v. United States, 1919, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979, regarding the nature of the grand jury,

It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning.

 On the other hand, it is equally clear from the *Johnson* case that Senator Gravel's legislative acts may not consistently with the Speech or Debate Clause be the subject of questioning before the grand jury.[4] The question of what constitutes legislative acts has been treated in decisions in civil actions cited with approval in the *Johnson* case. The classic statement appears in Kilbourn v. Thompson, 103 U.S. 168, 204, 26 L.Ed. 377, as follows:

> It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and and to the act of voting, whether it is done vocally or by passing between the tellers. In short, to things generally done in a session of the House by one of its members in relation to the business before it.

In view of the primary purpose of the privilege "to prevent intimidation by the executive and accountability before a possibly hostile Judiciary," United States v. Johnson, *supra*, 383 U.S. at 181, 86 S.Ct. at 755, the protection of the privilege

afforded by the Speech or Debate Clause may be broader in criminal proceedings than in civil. Therefore the court sustains Senator Gravel's claim that whatever he did at the subcommittee meeting on June 29 and certain acts done in preparation therefor are privileged.

The Government has argued that the Senator's conduct at the subcommittee meeting is unprivileged because the purpose of the meeting, the reading of the Pentagon Papers, was unrelated to any investigation or undertaking authorized by the parent Committee on Public Works or by the Senate in its delegation of power to the parent committee. Senator Gravel has suggested that the availability of funds for the construction and improvement of public buildings and grounds has been affected by the necessary costs of the war in Vietnam and that therefore the development and conduct of the war is properly within the concern of his subcommittee. The court rejects the Government's argument without detailed consideration of the merits of the Senator's position, on the basis of the general rule restricting judicial inquiry into matters of legislative purpose and operations. "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." Tenney v. Brandhove, 1951, 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019.

 There are, of course, occasions when a court is obliged to scrutinize the powers of a congressional committee and the relationship of its activities to its legitimate legislative purpose. But such occasions have been limited to cases in which the power of Congress under the Constitution has been at issue, e. g., Kilbourn v. Thompson, *supra*, or where the constitutional rights of individuals have been jeopardized by congressional action,

---

4. On a later appeal from Johnson's conviction upon retrial, United States v. Johnson, 4 Cir., 1969, 419 F.2d 56, it was held that the grand jury's receipt of evidence about Johnson's speech, while

"constitutionally impermissible," did not invalidate the indictment, citing Costello v. United States, 1956, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397.

as in cases dealing with prosecutions, under 2 U.S.C. § 192 for contempt of Congress, e. g., Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L. Ed.2d 1273. As stated in the latter case, at 205, 77 S.Ct. at 1188:

> It is, of course, not the function of this Court to prescribe rigid rules for the Congress to follow in drafting resolutions establishing investigating committees. That is a matter peculiarly within the realm of the legislature, and its decisions will be accepted by the courts up to the point where their own duty to enforce the constitutionally protected rights of individuals is affected.

It has not been suggested by the Government that the subcommittee itself is unauthorized, nor that the war in Vietnam is an issue beyond the purview of congressional debate and action. Also, the individual rights at stake in these proceedings are not those of a witness before a congressional committee or of a subject of a committee's investigation, but only those of a congressman and member of his personal staff who claim "intimidation by the executive." United States v. Johnson, *supra*, 383 U.S. at 181, 86 S.Ct. 749, 15 L.Ed.2d 681. "The courts have no right to dictate * * * the procedures for Congress to follow in performing its functions. * * * " United States v. Hintz, N.D.Ill., 1961, 193 F.Supp. 325, 331. Judging the applicability of the legislative privilege in the exercise of the functions of a legislator's office should be done "without inquiring whether the exercise was regular according to the rules of the House, or irregular and against their rules." Coffin v. Coffin, 1808, 4 Mass. 1, 27.

▮▮▮ Senator Gravel's arranging for private publication of the Pentagon Papers by Beacon Press stands on a differ-

ent footing and, in the court's opinion, is not embraced by the Speech or Debate Clause.[5] The test is not the public benefit or political value of such private publication [6] but whether it is a legislative act, i. e., "related to the due functioning of the legislative process," United States v. Johnson, *supra*, 383 U.S. at 172, 86 S.Ct. at 751, or "generally done in a session of the House by one of its members in relation to the business before it." Kilbourn v. Thompson, *supra*, 103 U.S. at 204. Guidance is available mainly in decisions in civil actions dealing with congressmen's civil liability for libel. A distinction has been drawn in the cases between defamatory words inserted in the Congressional Record, held to be privileged, and defamation resulting from a congressman's circulation of reprints or copies of the Congressional Record to his constituents. As to the latter, McGovern v. Martz, D.D.C., 1960, 182 F.Supp. 343, at 347, held that the absolute privilege of the Speech or Debate Clause does not apply to republication, stating "The reason for the rule—complete and uninhibited discussion among *legislators*—is not here served." See Restatement of Torts, 1938 ed., § 590, comment b. In Hentoff v. Ichord, D.D. C., 1970, 318 F.Supp. 1175, an issue was whether the court had power to enjoin distribution of a House committee report by the Public Printer and Superintendent of Documents. In holding that it did, the court said at 1180,

> Nothing in the Constitution or the cases suggests, however, that a committee report is a necessary adjunct to speech or debate in Congress. * * and its further printing and public distribution is not necessary to give effect to the freedom of Congressmen to speak and debate on or off the floor. The Speech or Debate Clause does not

---

5. The Senator has made no specific claim that his legislative privilege extends to his actions subsequent to the subcommittee hearing. However, this claim has been advanced by Dr. Rodberg and contested by the Government and hence the court has considered it.

6. The importance of the "informing function of Congress" is described in powerful terms in a quotation from Wilson, Congressional Government (1885), 303, set forth in fn. 6 of the opinion of the Court in Tenney v. Brandhove, *supra*, 341 U.S. at 377, 71 S.Ct. 783.

necessarily bar an action to enjoin the Public Printer from printing a committee report for public distribution.

While recognizing a special vitality attaching to the Speech or Debate Clause in criminal proceedings, United States v. Johnson, *supra*, 383 U.S. at 180–182, 86 S.Ct. 749, the court nevertheless concludes that the reasoning of these civil cases is valid and in the instant case controlling.

■■■■■■■ Having delineated the area of Senator Gravel's conduct which may not be investigated by the grand jury, the court turns to the question whether some of Dr. Rodberg's activities are also protected from investigation, not because of any privilege of his own but by reason of his having acted as the Senator's agent and assistant in the Senator's performing various legislative acts.[7] The Senator and witness submit, and the court agrees, that the legislative privilege enjoyed by a senator must extend to some activities of a member of his personal staff acting at his direction. To rule otherwise would dilute and jeopardize the privilege itself. For example, speeches delivered on the floor of Congress are often drafted by a skilled staff assistant and not by the congressman himself; to make such an assistant accountable for the content of a speech drafted by him would serve to defeat the privilege. A legislator's dependence upon confidential assistants is analogous to a lawyer's, whose client's privilege against disclosure of confidential communications has been held applicable to the lawyer's assistants. United States v. Kovel, 2 Cir., 1961, 296 F.2d 918. The opinion in that case stated at 921, "The complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others. * * *" This holding has been adopted by the Proposed Rules of Evidence for the United States Courts, Preliminary Draft, 1969, Rule 5–03(b). Although the attorney-client privilege is of ancient origin, 8 Wigmore, Evidence (McNaughton Rev.1961), § 2290, p. 542, and is grounded on strong social policy, it is not a constitutional privilege and surely does not warrant broader protection than the legislative privilege based upon the Speech or Debate Clause. In this respect the legislative privilege is akin to the executive privilege about which the Supreme Court in Barr v. Matteo, 1959, 360 U.S. 564, at 573, 79 S.Ct. 1335, at 1340, 3 L.Ed.2d 1434, commented:

> The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

■■■■ Powell v. McCormack, 1969, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491, and similar cases permitting actions against subordinate employees of legislative bodies are distinguishable. Employees held accountable in such cases were administrative personnel whose non-discretionary duties to the legislative body as a whole in no substantial way related to the specific furtherance of the legislative tasks of individual members. Such institutional employees clearly have less impact upon legislation than personal staff members entrusted by the legislator himself with sensitive and confidential duties. Therefore the court holds that the Speech or Debate Clause prohibits inquiry into things done by Dr. Rodberg as the Senator's agent or assistant which would have been leg-

7. Despite Kilbourn v. Thompson, *supra*, and Tenney v. Brandhove, *supra*, the related doctrine of legislative immunity is applicable, though not absolutely, to officers and employees of legislative bodies.

Dombrowski v. Eastland, 1967, 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577. In this sense, therefore, such employees have rights flowing from the Speech or Debate Clause.

islative acts, and therefore privileged, if performed by the Senator personally.

■ Lastly, the relief to which Senator Gravel is entitled under the particular circumstances here presented must be determined in the light of two of the principles derived from the decisions discussed in this memorandum: a congressman may not be prosecuted for legislative acts but may be prosecuted for non-legislative acts; and in any such prosecution no evidence from any source of a congressman's legislative acts may be considered against him. A further consideration is the self-evident proposition that no prosecuting attorney, grand jury foreman or other official has lawful authority to prohibit or foreclose a federal grand jury from investigating any offenses against the United States. Therefore, if Senator Gravel's rights under the Speech or Debate Clause are to be fully protected, a protective order will be required limiting the subject matter of the current grand jury's investigation and not merely the questions which may be put to Dr. Rodberg, the witness under subpoena.

■ For the foregoing reasons it is ordered that the motions to quash and for specification be denied, but that the following PROTECTIVE ORDER be entered:

(1) No witness before the grand jury currently investigating the release of the Pentagon Papers may be questioned about Senator Mike Gravel's conduct at a meeting of the Subcommittee on Public Buildings and Grounds on June 29, 1971 nor about things done by the Senator in preparation for and intimately related to said meeting.

(2) Dr. Leonard S. Rodberg may not be questioned about his own actions on June 29, 1971 after having been engaged as a member of Senator Gravel's personal staff to the extent that they were taken at the Senator's direction either at a meeting of the Subcommittee on Public Buildings and Grounds or in preparation for and intimately related to said meeting.